UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- X
                                        :
GUS BEVONA,                             :
                     Plaintiff,         :
                                        :    05 Civ. 1157 (DLC)
-v-                                     :
                                        :    OPINION AND ORDER
SERVICE EMPLOYEES INTERNATIONAL UNION,  :
AFL-CIO, ANDREW STERN, individually and :
as President of the SERVICE EMPLOYEES   :
INTERNATIONAL UNION, LOCAL UNION 32B-   :
32J, AFL-CIO, SERVICE EMPLOYEES         :
INTERNATIONAL UNION LOCAL UNION 32B-    :
32J-144, MICHAEL FISHMAN former trustee :
and as President of SERVICE EMPLOYEES   :
INTERNATIONAL UNION, LOCAL UNION 32B3-  :
32J, AFL-CIO and as the Administrator   :
of the SEIU LOCAL 32B-32J RESOLUTION    :
AND BENEFIT EQUALIZATION PLAN FOR GUS   :
BEVONA, International Vice President     :
THOMAS BALINOFF, as former trustee of   :
SERVICE EMPLOYEES INTERNATIONAL UNION,  :
LOCAL UNION 32B-32J the BOARD OF        :
TRUSTEES OF THE SEIU LOCAL 32B-32J      :
RESOLUTION AND BENEFIT EQUALIZATION     :
PLAN FOR GUS BEVONA and/or any JOHN     :
DOES 1-10, constituting trustees, plan  :
sponsors and/or plan administrators of  :
the SERVICE EMPLOYEES INTERNATIONAL     :
UNION, LOCAL UNION 32B-32J-144          :
SEVERANCE AND BENEFIT EQUALIZATION PLAN :
FOR GUS BEVONA, individually and        :
jointly and severally,                  :
                     Defendants.        :
                                        :
                                        :
                                        :
                                        :
                                        :
                                        :
--------------------------------------- X

Appearances:

For Plaintiff:

Christopher A. Smith
1311 Mamaroneck Avenue
Suite 170
New York, New York 10605

For Defendants:

Robert M. Weinberg
W. Gary Kohlman
Todd E. Edelman
Leon Dayan
Bredhoff & Kaiser P.L.L.C.
805 15th Street N.W.
Suite 1000
Washington, D.C. 20005

Daniel Engelstein
David M. Slutsky
Levy Ratner, P.C.
80 Eighth Avenue
Eighth Floor
New York, New York 10011

DENISE COTE, District Judge:

    Plaintiff Gus Bevona ("Bevona") is a former Vice President

of the defendant Service Employees International Union ("SEIU"

or the "International"), former President of defendants SEIU

Local 32B-32J ("Local 32BJ") and SEIU Local 32B-32J-144 ("Local

144"), and former trustee of various benefit funds associated

with these entities.  He resigned from these positions on

February 1, 1999.  The present action arises out of a dispute as

to the benefits to which Bevona is entitled following

resignation.  Bevona seeks additional pension and severance benefits and payment of legal fees.

Bevona brought the present action on February 1, 2005, six years to the day after his resignation.  In his Amended Complaint, filed on September 15, 2005, he asserts that a 1994 document titled SEIU LOCAL 32B-32J RESOLUTION AND BENEFIT EQUALIZATION PLAN AGREEMENT FOR GUS BEVONA[1] ("Bevona Pension Plan") required union defendants to make pension contributions and benefit payments to a pension plan created specifically for his benefit without regard to the tax code limitations on employer contributions and participant benefits that applied to the union's regular pension plans.  He asserts that this obligation is confirmed in his February 1, 1999 resignation agreement ("February 1 Settlement Agreement"), as supplemented by a letter Bevona signed on January 21, 1999.  For his severance benefits claim he relies principally on a Local 144 Board authorization of a new severance plan.  Finally, the claim for attorney fees stems from a 32BJ Executive Board authorization.

---

[1] The parties also refer to this document as the "Rabbi Trust."

Bevona brings claims[2] under Section 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), to recover benefits due under the terms of ERISA-covered plans (Count I); under ERISA Section 510, 29 U.S.C. § 1140, for employer interference with Bevona's rights under qualified benefit plans (Count II); for breach of contract, based on failure to pay benefits due under the aforementioned agreements (Counts III-V, VIII)[3]; for common law gross negligence and fraud, based on allegations that certain defendants told Bevona that he would be paid for legal fees and pursuant to the Bevona Pension Plan (Count VI); for a declaratory judgment affirming Bevona's entitlement to benefits under the Bevona Pension Plan and Local 144's new severance plan (Count VII); for failure to comply with reporting and disclosure requirements in 29 C.F.R. § 2520.104-23(b) and 29 U.S.C. §1024(b) (Count VIII); for conversion (Count IX); for breach of the covenant of good faith and fair dealing (Count X); and for unjust enrichment, based upon the International and Locals having accepted Bevona's services during the course of his employment.

---

[2] Unless otherwise noted, each claim pertains to the benefits allegedly established by the Bevona Pension Plan, the new Local 144 severance plan, and the promise to reimburse Bevona for legal fees.

[3] In his complaint, Bevona also alleges entitlement to benefits from "the defendants' health . . . plans," but this issue is unaddressed in either side's summary judgment papers. This claim is addressed in a separate Order issued today.

The defendants bring this motion for summary judgment, arguing primarily that the undisputed facts show that Bevona was neither contractually nor statutorily entitled to the claimed benefits.  They resist Bevona's claims for additional pension payments on the ground that the Bevona Pension Plan was not authorized by the union's Joint Executive Board.  They contend that the additional severance payments that Bevona seeks, although authorized by the union's board, were never reduced to a formal plan or commitment.  Finally, they assert that Bevona incurred no legal expenses.  Bevona cross-moves for summary judgment.  For the reasons stated below, the defendants' motion for summary judgment is granted, and the plaintiff's motion for summary judgment is denied.

BACKGROUND

The parties dispute the legal significance of many facts at issue in this case but have relatively few factual disputes.[4]

---

[4] The plaintiff's Local Rule 56.1(b) statement does not comply with the requirement that it include "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party."  Loc. R. Civ. P. 56.1(b).  It specifies only certain paragraphs as being in dispute, or as statements of law that require no response.  Pursuant to Local Rule 56.1(c), those paragraphs of the defendants' Local Rule 56.1(a) statement to which the plaintiff has failed directly to respond are deemed admitted.

The plaintiff also submitted a thirty-page affidavit with his reply memorandum of law.  Both this affidavit and the affidavit Bevona submitted with his motion for summary judgment and

Any disputes regarding potentially material facts are noted below.  The factual discussion will begin with a description of the three plans that are critical in construing Bevona's claims for additional pension benefits.

The 32BJ Pension Plan and its Summary Plan Description

At least until 1992, Bevona was a participant in the SEIU 32B-32J Money Purchase Plan ("32BJ Pension Plan").  The 32BJ Pension Plan, as amended in 1989, is a defined contribution plan.  A defined contribution plan is "a pension plan which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses . . . ."  Esden v. Bank of Boston, 229 F.3d 154, 158 n.6 (2d Cir. 2000) (citing ERISA § 3(34), 19 U.S.C. § 1002(34)) (emphasis omitted).

According to its summary plan description ("SPD"), the 32BJ Pension Plan calculates employer contributions on behalf of each participant by adding 5.6 percent of a participant's total compensation and 5.4 percent of the participant's compensation in excess of eighty percent of the Social Security Taxable Wage Base.  The plan limits these employer contributions to maintain

---

opposition to the defendants' motion largely consist of legal arguments, which do not belong in an affidavit.

the pension trust's tax-qualified status under the Internal Revenue Code ("IRC"), meaning that the trust is exempt from taxation.  See 26 U.S.C. §§ 401(a)(17), 415, 501(a).  To achieve tax-qualified status, contributions are computed based on a cap on annual employee compensation at roughly $200,000[5] ("compensation cap").  26 U.S.C. § 401(a)(17).

The International Pension Plan

In addition to the 32BJ Pension Plan, Bevona was a participant in the International's Affiliates Officers and Employees Pension Plan (the "International Pension Plan"), a tax-qualified defined benefit plan.  Under ERISA, a "defined benefit plan" is a plan "other than an individual account plan." Esden, 229 F.3d at 158 n.6 (citing ERISA § 3(35), 29 U.S.C. § 1002(35)).[6]  Rather than maintaining individual employee accounts to which an employer contributes during the course of a plan participant's employment, a traditional defined benefit plan might promise an annual pension benefit to an employee based

---

[5] IRC § 401(a)(17) set this cap at $200,000, to be adjusted for cost-of-living increases.  The summary plan description ("SPD") for the 32BJ Pension Plan states that "the Plan, by law, cannot recognize compensation in excess of $228,860."

[6] An individual account plan is also referred to as a defined contribution plan.  There are significant ramifications to creating a plan as an individual account plan as opposed to a defined benefit plan.  The latter are subject to certain legal restraints from which from which the former are exempt.  Esden, 229 F.3d at 158-59 & n.6.

upon the multiplication of some percentage of an employee's final salary by the employee's years of service.  Id. at 158 n.4.  The International Pension Plan requires participating organizations to make monthly contributions to the plan equal to fourteen percent of the monthly gross compensation of each of its full-time officers and employees.  It computes benefits to be paid to a retired employee according to a formula that takes into account years of service and the average of the employee's highest three years of gross compensation.  For purposes of both of these calculations, the International Pension Plan caps gross compensation at the maximum amount permitted under the IRC for tax-exempt trusts.  See 26 U.S.C. § 401(a)(17).


The Bevona Pension Plan

    In 1992, Bevona asked that he be excluded from the Local 32BJ Pension Plan and that a new plan for his sole benefit be established.  As reflected in the minutes of a December 12, 1992 meeting of the Local 32BJ Executive Board,[7]

        Bevona noted that due to certain technicalities in the
        tax regulations, he would not receive any of the
        monies contributed on his behalf to the Money Purchase
        Plan [Local 32BJ Pension Plan] covering officers,
        chairmen, secretaries and business agents.  However,
        he said a separate plan could be established for him
        with the same amount of money paid on his behalf to

_____

[7] This executive board is also referred to as the Joint Executive Board.

8

the money purchase plan and he could then derive the
benefit of those monies.  Therefore, <u>he requested that
the Board</u> amend the purchase plan effective with the
year 1992 to exclude coverage for him and to <u>establish
a separate plan for his benefit with the same
contribution being made to that plan</u>.

(Capitalization omitted) (emphasis supplied).  This request was
unanimously approved.

Nearly two years later, on September 14, 1994, Bevona and
Nicholas Caprio, Secretary-Treasurer of Local 32BJ, signed the
Bevona Pension Plan.  The original version of this document,
which may since have been modified, was drafted by outside
benefits consultant Thomas Harter.  The preamble states that it
was created pursuant to action taken by the 32BJ Executive Board
at the December 12, 1992 meeting.  The preamble adds that
"Bevona is a participant in the Qualified Plans,[8] both of which
will not accept contributions from the Union or credit
compensation in excess of the limits codified in Section
401(a)(17) of the Internal Revenue Service Code" and that both
parties intend to permit Bevona "to receive benefits <u>in excess</u>"
of these limits "as they apply to the Qualified Plans."
(Emphasis supplied.)  The Bevona Pension Plan thereafter states
that Bevona will be entitled, upon separation from employment,

---

[8] The document does not define the term "Qualified Plans," but the
evidence provided shows that, as of that date, Bevona
participated in only the 32BJ Pension Plan and the International
Pension Plan.  The December 12, 1992 action by the Local 32BJ
Executive Board authorizing creation of a separate plan for
Bevona had not referred to the International's Pension Plan.

to "an amount equal to the contribution requirements of the Qualified Plans which has not been or may not be contributed on Bevona's behalf to such Qualified Plans in current, prior or future calendar years," plus interest.  The document is worded as an agreement between Bevona and Local 32BJ, and the signature block contains the name of this union followed by the word "By:" and Caprio's signature.

1995 Local 144 Severance Resolution

At a January 25, 1995 meeting of the Local 144 Executive Board, Bevona described a potential severance plan, "to be implemented at some time in the future," which "was to provide for 2 years of pay after 10 years of service" to all of the Union's officers and business agents.  (Capitalization omitted.) "He called for a motion to approve the new severance plan to be implemented in the near future, as outlined."  The motion was unanimously approved.[9]  There is no evidence that the severance

---

[9] Bevona's contention in his Local Rule 56.1 statement that this plan was approved at a January 25, 1995 meeting of the Local 32BJ Board (as opposed to the Local 144 Board) is unsupported by proffered evidence and may be a typographical error.  Although not at issue in this case, a severance pay plan for employees of Local 32BJ who were not covered by another local's collective bargaining agreement was approved on October 5, 1998.  The Joint Executive Board minutes state that the plan would entitle covered employees with ten or more years of service to a severance benefit equal to one year's salary at the employee's salary level in the year preceding termination, and that covered employees would thereafter be entitled to one additional month

program contemplated by the January 25, 1995 board action was
ever drafted, adopted, or implemented.

Initial Negotiations Over Bevona's Resignation

In 1997, two Local 32BJ members, Carlos Guzman and Dominick
Bentivegna, filed a lawsuit (the "Guzman/Bentivegna case")
against Bevona and Local 32BJ.  One condition of the voluntary
dismissal of this lawsuit proved to be a promise by the union
that Bevona would resign from his union positions.

On October 1, 1998, Bevona entered discussions concerning
his resignation with Ronald Raab ("Raab"), an attorney at the
firm that served as general counsel to the Locals, and James
Manning ("Manning"), another attorney who had formerly
represented the International and who, in October 1998, was
counsel to the International Pension Plan.  In these
discussions, Manning acted as an informal mediator.  Although
Manning became involved in the negotiations at the
International's request, he did not represent either the
International or Bevona in the negotiations.[10]  Manning, and

---

of severance pay per additional year of service, to a maximum of
two years' salary after twenty-two years of service.  It
described specific payment options and employees covered.

[10] Although Bevona claims in his affidavit that he believed
Manning was acting on behalf of the International, this
statement is contradicted by an admission at his deposition.
See Buttry v. General Signal Corp., 68 F.3d 1488, 1493 (2d Cir.

arguably Raab, told Bevona that the International wanted him to leave his positions at the Locals to facilitate the International imposing a trust over both Locals.  There is a genuine question of fact as to whether Manning indicated that, if Bevona did not resign, the International would interfere with the distribution to Bevona of benefits to which he was entitled under SEIU benefit plans.


Guzman/Bentivegna Legal Fees

At the October 29, 1998 meeting of the Joint Executive Board, Bevona presented a motion to obtain reimbursement for legal fees arising from the Guzman/Bentivegna case.  The minutes read in pertinent part:

> The President [Bevona] then noted that he was being sued for legal fees expended by the Union in connection with the surveillance case, the $100,000 judgement [sic] in that case and the entire cost of publication and distribution of the history and union book.  He discussed the legal situation and indicated that the Union could reimburse his legal expenses if he won the case.  He then called for a motion to have the Union reimburse him for all legal fees expended in connection with his defense in the lawsuit of Guzman and Bentivegna v. Bevona, to the fullest extent permitted by law.

The motion carried unanimously.

---

1995) ("[I]t is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment.").

In late 1998, two legal defense funds ("LDFs") were created
to pay Bevona's legal fees and expenses in the Guzman/Bentivegna
case.  Bevona did not contribute to these funds and did not
personally pay any legal fees or expenses incurred in
Guzman/Bentivegna.

Bevona points to no evidence that he told attorney Robert
M. Weinberg ("Weinberg"), who represented the International in
the negotiations, about the creation of the LDFs during his
retirement negotiations.  Although Weinberg was aware of the
LDFs' existence after the signing of the February 1 Settlement
Agreement, which is described below, Bevona points to no
evidence that could establish that Weinberg was aware prior to
February 1999 of the existence of the LDFs.

Bevona told Weinberg prior to February 1 that he had
incurred legal expenses out of his own pocket.[11]  Prior to the
execution of the February 1 Settlement Agreement, Weinberg told
Bevona he would look into the legality of reimbursing Bevona for
his legal fees if he resigned and that, if legally permissible,
he would recommend to International President Andrew Stern
("Stern") that the fees be paid, and that he was confident they

---

[11] Bevona's 56.1 Statement states that Bevona never told Weinberg
that he personally incurred the Guzman/Bentivegna legal
expenses, but only that "there were expenditures that he wanted
reimbursed."  The deposition testimony that Bevona cites in
support of this contention, however, does not describe any
communications between Bevona and Weinberg.

could be paid if he made that recommendation.  Neither Weinberg
nor any International representative made a more definite
promise to Bevona that he would be reimbursed for the
Guzman/Bentivegna legal fees.


Continued Negotiations and the January 21, 1999 Bevona-Manning
Letter

In late 1998 and January 1999, Bevona discussed the terms
of his retirement with the International.  Speaking through its
attorney, Weinberg, the International told Bevona that if he did
not agree to give up his positions with the Locals, it could
remove him and place the Locals under trusteeship.  Bevona avers
that he interpreted this as a threat to deny him benefits upon
termination, although he does not claim that Weinberg expressly
threatened a denial of benefits.

After the parties had arrived at a draft resignation
letter, Manning drafted another letter dated October 27, 1998,
which was subsequently signed by Bevona.  There is some evidence
that Manning drafted the October 27 letter at Weinberg's
request, to identify the particular benefits to which Bevona
claimed entitlement.  There is no evidence that any Union
representative drafted or signed this letter.  The letter,
addressed to Manning, reads:

> You have asked me to give you a complete list of what
> is included in the following passage set forth in

paragraph 2 of my letter to President Stern dated
October 27, 1998: "established benefits from Local
32B-32J and Local 32B-32J-144 to which I am lawfully
entitled under the duly adopted benefit programs of
those locals in effect as of October 15, 1998."  That
list is as follows:

1.    unused vacation pay from both locals;

2.    pension entitlement from both locals (including my
      401K plan and the trust duly established on        by
      Local 32B-32J)[12];

3.    severance pay benefits from both locals; and

4.    term life insurance policy from Local 32B-32J.

Bevona forwarded the letter to Manning, and it was delivered to

SEIU and Weinberg in October 1998.

     Manning later drafted another letter dated January 21,

1999.  The January 21 letter ("January 21 Bevona-Manning

Letter") contains text identical to that of the October 27

letter, except that the date of October 27, 1998 in the first

paragraph was changed to January 19, 1999, and the parenthetical

in numbered paragraph 2 reads "including my 401K plan and the

trust duly established by Local 32B-32J."  The January 21 letter

was again signed by Bevona, forwarded to Manning, and delivered

to the SEIU and its counsel prior to the International's

execution of the February 1 Settlement Agreement.

     There is no evidence that during these negotiations Bevona

gave the union negotiators documentation concerning the Bevona

---

[12] The space for a date is left blank in the October 27, 1998
letter.

Pension Plan, the Local 144 Executive Board severance resolution, or the Local 32BJ Executive Board legal fees resolution.  There is at least a question of fact as to whether Bevona complied with all document requests during the negotiations.  Bevona has not identified any conversation in which he explicitly discussed the Bevona Pension Plan with the union negotiators during this period.


February 1, 1999 Settlement Agreement

On January 21, 1999, Bevona signed the February 1 Settlement Agreement, the product of the previously described negotiations, and transmitted it to Stern.  Stern signed the letter on behalf of the International and dated it February 1.

The letter set forth the terms under which Bevona would give up all of his positions at the Locals and International and related entities.  Its fourth paragraph states that Bevona proposes "that the undersigned parties be bound by the following agreement."  In numbered paragraph 2, Bevona agreed to retire permanently from all SEIU-related offices and positions and that following retirement he would:

> "collect no compensation, payments or benefits of any kind from SEIU or from any SEIU-related entity other than the established benefits from Local 32B-32J and Local 32B-32J-114 to which I am lawfully entitled under the duly adopted benefit programs of those locals in effect as of October 15, 1998, as well as the retirement entitlement due me under the

> International's Employees' pension plan; the sole
> exception permitted is the grant of continued health
> insurance coverage by Local 32B-32J to fill any gap in
> health insurance coverage until I am eligible for
> Medicare coverage pursuant to a duly authorized action
> of that Local's executive board.

(Emphasis supplied).   The text of the February 1 Settlement

Agreement does not refer to the January 21 Bevona-Manning

Letter.

Bevona fulfilled all of his obligations under the February

1 Settlement Agreement.   Pursuant to this agreement, he received

a lump sum payment totaling over $1.8 million.   This amount

included unused vacation pay from both Locals, severance pay

from Local 32BJ, and $261,230.00 from Local 32BJ's Money

Purchase Plan.

Bevona did not receive, and claims entitlement to, the

following three payments:   First, he claims funds arguably

authorized by the Bevona Pension Plan, which he claims include

the total of the funds that would have been authorized under the

32BJ Pension Plan and the International Plan, without regard to

the limits on compensation imposed to maintain the tax-qualified

status of a pension plan. [13]   Second, Bevona seeks severance pay

---

[13] Bevona does not contest that he received $261,230.00 in pension
benefits under the 32BJ Pension Plan.   This appears to be the
sum he was owed without regard to any extra contribution right
to which he contends he was entitled through the Bevona Pension
Plan.   To the extent that he is claiming a failure to pay him
benefits at the level that would be required by the tax-
qualified 32BJ Pension Plan and the International Pension Plan,

from Local 144, pursuant to the Board resolution of January 25, 1995.  Finally, he seeks reimbursement for legal funds expended by the two LDFs in connection with the Guzman/Bentivegna case.


DISCUSSION

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P.  The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination the court must view all facts in the light most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" of the movant's pleadings.  Rule 56(e), Fed.R.Civ.P.; accord Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 169 (2d Cir. 2006).

---

he has not made that claim explicit and it is not addressed here.

I.   Claims based on Failure to Pay Benefits Under the
     Terms of the Bevona Pension Plan

Bevona seeks pension benefits beyond the amount to which he
is entitled under the Local 32BJ Pension Plan and the
International Pension Plan.  He contends that a special plan
adopted for him alone in 1994 -- the Bevona Pension Plan --
entitles him to extra benefits.  Bevona believes he was entitled
to pension contributions from Local 32BJ and the International
to the Bevona Pension Plan based on his total salary, which
substantially exceeded the annual compensation cap contained in
the 32BJ and International Pension Plans.

Bevona bases this claim of entitlement on both the Bevona
Pension Plan and the February 1 Settlement Agreement.  He
contends that the February 1 Settlement Agreement preserved the
entitlement created by the Bevona Pension Plan.

a.   ERISA and Breach of Contract

Bevona's claim for extra pension benefit payments fails
whether it is analyzed as a claim for denial of benefits under
ERISA Section 502(a)(1)(B) or as a common law claim for breach
of contract.[14]  Section 502(a)(1)(B) claims for denial of

---

[14] The parties have not addressed whether Bevona's common law
claims are preempted by ERISA or the Labor Management Reporting
and Disclosure Act ("LMRDA").  See Wall v. Constr. & Gen.
Laborers' Union, Local 230, 224 F.3d 168, 178 (2d Cir. 2000).
Because the common law contract claims would fail for the same
reason the ERISA claims that the plaintiff has pled fail, and
because the remaining common law claims, if addressed, would

benefits are analyzed by applying federal common law contract
principles.  See Gibbs ex rel. Estate of Gibbs v. CIGNA Corp.,
440 F.3d 571, 576 n.8, 578 (citation omitted).

        First, the Bevona Pension Plan exceeded the authorization
given by the Local 32BJ Executive Board on December 12, 1992,
and therefore failed to create any new, ERISA-protected
entitlement.  See Guzman v. Bevona, 90 F.3d 641, 647 (2d Cir.
1996) (applying principle that expenditures that violate the
union's constitution "represent the classic case of breach of
fiduciary duty" in lawsuit against Bevona).  Board authorization
was required to give Caprio authority to sign the Bevona Pension
Plan.  At all relevant times, the Constitution and Bylaws of
Local 32BJ provided that the "actions and determinations [of the
Joint Executive Board] shall be operative and in force unless
modified or reversed at a meeting of the Local."  It also stated
that, "[u]pon and with the recommendation of the President and
Secretary-Treasurer, it shall determine the amount of
compensation to be paid to employees of the Local and to members
of Boards, Committees and delegates."

        The minutes of the Board meeting, quoted above, reflect
that the authorization was limited to creating a new plan for

---

fail as well, it is unnecessary to determine whether the Court
should sua sponte address the preemption issues.  See, e.g.,
Gallione v. Flaherty, 70 F.3d 724, 729 (2d Cir. 1995).

Bevona's benefit that would allow the Local to make "the same contributions" it was making to the 32BJ Pension Plan.  That authorization did not permit Local 32BJ to make contributions above those based on the compensation cap that applied to the 32BJ Pension Plan and the International Pension Plan.[15]  The Bevona Pension Plan itself recognizes that the 32BJ Pension Plan and International Pension Plan, in contrast to the Bevona Pension Plan, "will not accept contributions from the Union or credit compensation in excess of the limits codified in Section 401(a)(17) of the Internal Revenue Code."  Thus, the Bevona Pension Plan exceeded the authorization provided by the 1992 resolution.

　　　　As a high-ranking official of the Locals and International, Bevona was or should have been aware of the relevant provisions of the Local 32BJ Constitution.  He was unquestionably aware of the terms of the 1992 Board Resolution.  He could not reasonably have believed that Caprio possessed authority to bind Local 32BJ or the International to pay benefits that had not been authorized by the Board.

_____

[15] To the extent the plaintiff suggests that IRC § 401(a)(17) limits only "allocations" to employee accounts and not employer "contributions," this argument is of no avail.  Section 401(a)(17), by its plain language, limits "the annual compensation of each employee taken into account under the plan," and the pension plans at issue here take compensation into account in determining both employer contributions and employee benefits.

Second, the February 1 Settlement Agreement did not expand Bevona's entitlement to pension benefits.  Rather, it confirmed that his resignation did not extinguish "established benefits from Local 32B-32J and Local 32B-32J-144" to which he was "lawfully entitled under the duly adopted benefit programs of those locals in effect as of October 15, 1998."  The Bevona Pension Plan, to the extent it required contributions in excess of those authorized by the December 12, 1992 resolution, was not "duly adopted," and therefore the February 1 Settlement Agreement does not provide a basis for an award of increased benefits.

In support of his argument that the February 1 Settlement Agreement entitles him to the benefits he seeks in this case, Bevona argues that the January 21 Bevona-Manning letter should be treated as part of the February 1 Settlement Agreement, or alternatively should be used as parol evidence to explain the term "established benefits from Local 32B-32J and Local 32B-32J-144 to which I am lawfully entitled under the duly adopted benefit programs of those locals in effect as of October 15, 1998."  The February 1 Settlement Agreement does not reference the January 21 letter in any way, and Bevona has not proffered evidence sufficient to create an issue of fact as to whether the letter was part of the agreement.

Similarly, the January 21 letter is not admissible as extrinsic evidence to aid in interpreting the February 1 Settlement Agreement.  Where a contract is clear, unambiguous on its face, and fully integrated, "the intent of the parties must be gleaned from within the four corners of the instrument."  RJE Corp. v. Northville Indus. Corp., 329 F.3d 310, 314 (2d Cir. 2003) (citation omitted) (New York law); cf. Gibbs, 440 F.3d at 578-79 ("Unambiguous language in an ERISA plan must be interpreted and enforced in accordance with its plain meaning.").  Extrinsic evidence may not be used "to alter, vary or contradict" the terms of such an agreement.  A.H.A. Gen. Constr. v. New York City Hous. Auth., 699 N.E.2d 368, 375 (N.Y. 1998).

"Language is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement."  Gibbs, 440 F.3d at 579 (federal common law); see RJE, 329 F.3d at 314 (holding similarly, under New York law, that "contract terms are not ambiguous if they have a definite and precise meaning and are not reasonably susceptible to differing interpretations.").  "[M]ere assertion by a party that contract language means something other than what is clear when read in conjunction with the whole contract is not enough to create an ambiguity sufficient to raise a triable issue of

fact." Innophos, Inc. v. Rhodia, S.A., 832 N.Y.S.2d 197, 199 (App. Div. Mar. 22, 2007) (citation omitted).

The phrase "established benefits from Local 32B-32J and Local 32B-32J-144 to which I am lawfully entitled under the duly adopted benefits programs of those locals in effect as of October 15, 1998" is not reasonably susceptible to different interpretations, particularly in the context of an agreement negotiated by a high-ranking union official and union attorneys. The term "[d]uly adopted" unambiguously required a plan's adoption to comply with requirements in the International's or Locals' Constitutions.

The February 1 Settlement Agreement is a fully integrated contract. When a contract lacks an express integration clause the district court must "determine whether the parties intended their agreement to be an integrated contract by reading the writing in light of the surrounding circumstances." Starter Corp. v. Converse, Inc., 170 F.3d 286, 295 (2d Cir. 1999). Extended negotiations over its terms and the terms themselves may show that it was intended to be the "complete and final expression" of the parties' agreement. Gualandi v. Adams, 385 F.3d 236, 241 (2d Cir. 2004). Although the February 1 Settlement Agreement does not contain a formal integration clause, it does state that the parties are to "be bound by the following agreement." It was the fruit of extended negotiations

and must be considered an integrated contract.  Because the February 1 Settlement Agreement is integrated, Bevona may not rely on extrinsic evidence with respect to the breach of contract claims.[16]

Finally, Bevona makes a similar claim for extra pension benefits from the International.  Bevona argues that the International's Constitution itself authorized the Bevona Pension Plan to require that the International contribute fourteen percent of Bevona's entire annual compensation to his account.  This argument fails as well.

First, the value of the International's contribution to the International Pension Plan as a whole is distinct from the amount of benefits due any individual participant in that plan.  Therefore, even if the International's Constitution did require the International to make monthly contributions to its Pension Plan equal to fourteen percent of each employee's gross monthly compensation, such a requirement would not compel the International to provide any individual participant with

---

[16] Even if it were appropriate to consider the January 21 Bevona-Manning letter, the letter would not establish that the unions were authorized to or even that they had agreed to pay the benefits described in the Bevona Pension Plan.  The letter contains only a generic reference to "pension entitlement from both locals (including my 401K plan and the trust duly established by Local 32B-32J)."  This would include the 32BJ Pension Plan, but not necessarily the Bevona Pension Plan.

benefits in excess of those provided under the terms of this tax-qualified plan.

Second, the International's Constitution expressly states that the requirement that the SEIU contribute fourteen percent of each employee's compensation to its pension fund is "[s]ubject to any changes and amendments made by the International Executive Board pursuant to its authority set forth herein."  It also grants the Board of Trustees the power to "make all necessary amendments to the Pension Plan or Plans as may be required to render the Pension Trust Fund qualified and tax exempt under applicable provisions of the Internal Revenue Code . . . ."  The International Pension Plan, which employs a compensation cap in accordance with Section 401(a)(17) of the Internal Revenue Code, was approved by the International's Board of Trustees.  Bevona has pointed to no action by the International's Board that permitted the International to make contributions to its pension plan in excess of those permitted by the plan terms, nor that permitted the International Pension Plan to consider that portion of Bevona's salary above the compensation cap in calculating his benefits.

For the reasons above, summary judgment is granted to defendants on Bevona's ERISA Section 502(a)(1)(B) claim for failure to pay benefits due under the Bevona Pension Plan and

his claim that failure to pay these benefits constituted a breach of contract.[17] Because the Bevona Pension Plan did not give rise to an ERISA-protected entitlement to employer contributions in excess of those required by the pre-existing 32BJ Pension Plan, Bevona's claim for a declaratory judgment and his remaining claims under ERISA fail as well.

b. Unjust Enrichment

Bevona's claims for unjust enrichment do not survive summary judgment.  He alleges that the Locals and the International were unjustly enriched by his labor when he performed services for them in reliance on his expectation of benefits under the Bevona Pension Plan.  Under New York law, a cause of action for unjust enrichment requires a claim that "(1) the defendant was enriched, (2) at the expense of the plaintiff, and (3) that it would be inequitable to permit the defendant to retain that which is claimed by the plaintiff."  Clifford R. Gray, Inc. v. LeChase Constr. Servs., LLC, 819 N.Y.S.2d 182, 187 (App. Div. 2006).

The "existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes

---

[17] Count VIII of Bevona's amended complaint alleges in part that the defendants failed to comply with reporting and disclosure requirements of 29 CFR 2520.104-23(b), 29 USC 1030 or 1024(b). This allegation is not directly addressed in either summary judgment motion.  To the extent that this allegation may have been intended to state an additional theory of recovery, it is addressed by a separate Order issued today.

recovery in quasi contract for events arising out of the same subject matter." In re First Cent. Fin., 377 F.3d 209, 213 (2d Cir. 2004) (citation omitted).  The February 1 Settlement Agreement governs the subject matter in question because it limits the benefits Bevona may claim upon retirement.  As just explained, it excludes those in the Bevona Pension Plan. Therefore, summary judgment is granted to defendants on the unjust enrichment claim.

### c. Fraud and Gross Negligence

Summary judgment is also granted to the defendants on the fraud and gross negligence claims concerning the Bevona Pension Plan benefits.

> Under New York law, the five elements of a fraud claim must be shown by clear and convincing evidence: (1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff.

Crigger v. Fahnestock and Co., Inc. 443 F.3d 230, 234 (2d Cir. 2006).  "Gross negligence is conduct that evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing."  Am. Tel. & Tel. Co. v. City of New York, 83 F.3d 549, 556 (2d Cir. 1996) (citation omitted).

There is no evidence suggesting that the International's Constitution or Board actions involved any misrepresentations, omissions, intentional wrongdoing, or reckless disregard for

Bevona's rights.   Bevona himself formulated the language of the December 12, 1992 Board Resolution, so he knew the extent of the Board authorization and could not reasonably have relied on any promise that exceeded that authorization.   Therefore, summary judgment is granted to the defendants on the claims of fraud and gross negligence.

       d.   Conversion

    The plaintiff's conversion claim does not survive summary judgment because, among other reasons, it is untimely.   That the statute of limitations has run is undisputed.   Bevona argues that the statute of limitations should be tolled because of delays caused by settlement negotiations.   He points to no evidence that the defendants by fraud, misrepresentation, or deception induced him to delay filing his claims.   See Simcuski v. Saeli, 377 N.E.2d 713, 716 (N.Y. 1978).   The mere existence of settlement negotiations is insufficient to toll the statute of limitations.

        e.    Implied Covenant of Good Faith and Fair Dealing

     Under New York law, a covenant of good faith and fair
dealing is implied in all contracts.  511 West 232nd Owners
Corp. v. Jennifer Realty Co., 773 N.E.2d 496, 500 (N.Y. 2002).
"This covenant embraces a pledge that neither party shall do
anything which will have the effect of destroying or injuring
the right of the other party to receive the fruits of the
contract," id., and may thus be breached by conduct not
expressly forbidden by any contractual provision.  P.T. & L.
Contracting Corp. v. Trataros Constr., Inc., 816 N.Y.S.2d 508,
508 (App. Div. 2006).  Here, Bevona has not pointed to
sufficient evidence to support a finding that he was denied the
fruits of any valid contracts.  He therefore has not, and could
not establish a breach of the covenant of good faith and fair
dealing.  Summary judgment is granted to the defendants on all
claims for breach of this covenant.


     II.  Claims Concerning Local 144's Failure to Pay Severance
          Benefits

     a.   ERISA and Breach of Contract
     Summary judgment is granted on Bevona's ERISA Section
502(a)(1)(B) claim for severance benefits from Local 144.  The
January 25, 1995 resolution did not "establish" a severance

                               30

plan.  The 1995 Local 144 severance resolution described a plan
"to be implemented in the near future."  It is undisputed that
no further action was taken to implement this plan.  "[A]
decision to extend benefits is not the establishment of a plan
or program" for purposes of ERISA.  Guilbert v. Gardner, 480
F.3d 140, 146 (2d Cir. 2007) (citation omitted).  Establishment
depends on whether a plan exists in "reality."  Id.  In this
case, Bevona has identified no evidence that could establish the
actual existence of a severance plan.  Therefore, all of his
claims under ERISA relating to the claimed Local 144 severance
plan fail as a matter of law.

Summary judgment is also granted to the defendants on
Bevona's contractual claim of entitlement to Local 144 severance
benefits, and would be even if such claim were not preempted by
ERISA.  Because the 1995 resolution merely expressed intent to
create a severance plan in the future, the claimed contractual
entitlement never arose.  As the plan was not "in effect" as of
October 15, 1998, it is similarly not preserved under the
February 1 Settlement Agreement.  Because extrinsic evidence may
not be used to contradict the terms of the February 1 Settlement
Agreement, the fact that the January 21 Bevona-Manning letter
mentioned the severance payment is immaterial to the breach of
contract claim.  Therefore, summary judgment is granted to the
defendants on all of Bevona's ERISA claims concerning Local 144

severance benefits, as well as on the breach of contract and
declaratory judgment claims concerning these benefits.

>    b.   Remaining Claims

Bevona has also alleged that various defendants' failure to
pay him Local 144 severance benefits supports his claims for
gross negligence, fraud, conversion, breach of the covenant of
good faith and fair dealing, unjust enrichment, and declaratory
judgment.  Applying the legal standard articulated above, and
applying those standards to the evidence the plaintiff has
submitted, these claims must also fail.[18]  Summary judgment is
therefore granted to the defendants on these claims.


>    III.  Claims Based on Failure to Pay Bevona the Amount of
>          his Legal Fees in <u>Guzman/Bentivegna</u>

Although Bevona's complaint seeks reimbursement of legal
fees, he now admits that he paid no legal fees.  He has recast
his claim as one brought on behalf of the LDFs.

The LDFs are not named plaintiffs, and Bevona has not
established standing to bring claims on their behalf.  <u>See</u>

---

[18] The specific analysis applied to the fraud and gross
negligence claims above does not apply here.  Nevertheless, as
was true for the fraud and gross negligence claims concerning
the Bevona Pension Plan benefits, Bevona has not pointed to
evidence of particular misrepresentations, omissions, or grossly
negligent conduct by defendants.  Just as with the December 12,
1992 Board resolution, Bevona formulated the terms of the
January 25, 1995 resolution.

Farrell v. Burke, 449 F.3d 470, 494-95 & n.10 (2d Cir. 2006)

(jus tertii standing recognized where fundamental rights are

implicated); Mid-Hudson Catskill Rural Migrant Ministry, Inc. v.

Fine Host Corp., 418 F.3d 168, 173-74 (2d Cir. 2005) (third-

party standing requires a showing of "a hindrance to the

[injured parties'] ability to protect their own interests").

Therefore, summary judgment is granted to the defendants on all

claims based on the failure to reimburse Bevona for legal fees.


CONCLUSION

The defendants' motion for summary judgment is granted, and

the plaintiff's motion for summary judgment is denied.

SO ORDERED:

Dated:    New York, New York
          May 10, 2007

                          DENISE COTE
                          United States District Judge

33